FILED _____ ENTERED
LODGED _____ RECEIVED

MAR 15 2005   ES

AT SEATTLE
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
BY                                  DEPUTY

05-CV-05192-CMP

Received From
SEATTLE

MAR 16 2005

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

CC 5 - 5192 FDB

| | |
|---|---|
| CYNTHIA CORRIE and CRAIG CORRIE, ON THEIR OWN BEHALF AND AS PERSONAL REPRESENTATIVES OF RACHEL CORRIE AND HER NEXT OF KIN, INCLUDING HER SIBLINGS, <br><br> Plaintiffs, <br><br> v. <br><br> CATERPILLAR, INC., a Foreign Corporation, <br><br> Defendant. | Civil Action No. <br><br> COMPLAINT FOR WAR CRIMES; AIDING AND ABETTING EXTRAJUDICIAL KILLING; CRUEL, INHUMAN, OR DEGRADING TREATMENT OR PUNISHMENT; WRONGFUL DEATH; AND NEGLIGENCE <br><br> JURY TRIAL DEMANDED |

NOW COME Plaintiffs Cynthia Corrie and Craig Corrie on their own behalf and on behalf of their daughter, Rachel Corrie, and her next of kin, allege as follows:

## I.   PRELIMINARY STATEMENT

1.   On March 16, 2003, Rachel Corrie, a peace activist and United States citizen, was killed by a Caterpillar bulldozer while protesting the demolition of a Palestinian home. This is a civil action for compensatory and punitive damages against Caterpillar, Inc. for violations of international and state law committed against Rachel Corrie, including war crimes; aiding and abetting her extra-judicial killing; complicity in cruel, inhuman, or

PLAINTIFFS' COMPLAINT                - 1

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

ORIGINAL

degrading treatment or punishment ("CIDTP") that resulted in her death; negligence; and wrongful death.

2.    This lawsuit alleges that Caterpillar, Inc., has aided and abetted or otherwise been complicit in the Israel Defense Forces (hereinafter "IDF") in the above-mentioned human rights violations and war crimes by providing the bulldozers used to demolish homes of Palestinians in the Occupied Palestinian Territories in violation of international law when it knew, or should have known, that such bulldozers were being used to commit human rights abuses.

3.    The IDF has destroyed approximately 10,000 Palestinian homes since 1967 leaving approximately 50,000 men, women, and children homeless.  Over the last four years, the IDF has destroyed 4,100 homes.  Upon information and belief, Caterpillar, Inc. has supplied bulldozers to the IDF that have been used in such demolitions since 1967.

4.    As a result of these demolitions, Palestinian civilians have been killed, injured, displaced, and/or made homeless.  Home demolitions often take place with no adequate warning and in violation of due process rights, such as the right to fair hearing. The IDF rarely offers compensation and redress to the victims.  The IDF has also destroyed civilian roads, agricultural land, and other public and private property.

5.    Demolitions have taken place under three broad rationales:  1) to create 'buffer zones' that indiscriminately destroy entire neighborhoods of Palestinian homes and expel Palestinians simply for existing near Israeli military bases or the settlements and bypass roads that are themselves illegal under international humanitarian law; 2) for the purposes of collective punishment, which is prohibited by the Fourth Geneva Convention Relative to the Protection of Civilian Persons in Time of War ("Fourth Geneva Convention"); and 3) for the purposes of demographic engineering, *i.e.*, to limit and discourage Palestinian population growth, especially in occupied east Jerusalem but also near settlements in the West Bank.

PLAINTIFFS' COMPLAINT                          - 2

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE  (206) 398-4130
FACSIMILE  (206) 398-4136

1  These demolitions are often carried out through the discriminatory and arbitrary application
2  of building codes and other administrative means.

3       6.  The world community, including the United States, has consistently condemned
4  these demolitions.

5       7.  Caterpillar, Inc. had constructive notice of such violations since at least 1989 and
6  likely before, when human rights groups began to publicly condemn the demolitions, and
7  beginning in at least 1999, such condemnations were widely circulated in the international
8  press. In 2000 the U.N. Committee Against Torture condemned the policy of demolitions;
9  and in 2001 the European Union did as well.

10       8.  Caterpillar, Inc. has been on actual notice that the bulldozers it was supplying
11  have been used to commit crimes in violation of international law since at least 2001.
12  Beginning that year, human rights groups and concerned U.S. citizens began notifying
13  Caterpillar that it was aiding and abetting violations of international law by providing the
14  IDF with the bulldozers used to destroy homes.   Despite this, it continued to supply
15  bulldozers and essential parts to the IDF, which were used to commit the violations subject to
16  this lawsuit, even though the human rights violations and war crimes being committed by the
17  bulldozers and resultant damages were foreseeable.

18       9.  Rachel Corrie was intentionally killed by the IDF using a Caterpillar D9
19  bulldozer in Rafah, located in southern Gaza, on March 16, 2003, while she was trying to
20  protect a home from being demolished.

21                **II.**       **PARTIES**

22       10. Plaintiff Cynthia Corrie is the mother of decedent Rachel Corrie, who was killed
23  by the IDF's use of one of Defendant's bulldozers.  She resides in Olympia, Thurston
24  County, Washington, within the Western District of Washington.

25
26

PLAINTIFFS' COMPLAINT       - 3

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

11. Plaintiff Craig Corrie is the father of decedent Rachel Corrie, who was killed by the IDF's use of one of Defendant's bulldozers. He resides in Olympia, Thurston County, Washington, within the Western District of Washington.

12. Defendant Caterpillar, Inc., (hereinafter "Caterpillar") is incorporated in Delaware, with its primary place of business in Illinois. However, it does sufficient business in Washington to be considered a resident of Washington.

13. Plaintiffs are informed and believe, and on that basis allege, that at all times herein material, to the extent that said conduct was perpetrated by the IDF or other government officials, Defendants conspired in, confirmed, aided and abetted, and/or ratified, the same.

### III.      JURISDICTION

14. Plaintiffs allege that Defendant is liable for extra-judicial killing as defined by customary international law and the Torture Victim Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350, note). Plaintiffs further allege that Defendants are liable for violations of customary international law and treaty law prohibiting the commission of human rights violations and war crimes. Accordingly, this Court has jurisdiction over this action based on 28 U.S.C. § 1331. The Court also has diversity jurisdiction over the federal claims pursuant to 28 U.S.C. § 1332. The Court has jurisdiction over the state claims pursuant to §1367.

15. Venue is proper in the United States District Court for the Western District pursuant to 28 U.S.C. § 1391(b)(1) and/or (3), as this Court has personal jurisdiction over Defendant.

### IV.      STATEMENT OF FACTS

#### A. Background of Home Demolitions

16. The 1967 Six-Day War left Israel in control of the Gaza Strip, the West Bank, the Sinai Peninsula, and the Golan Heights. Under international law, the occupation of the

PLAINTIFFS' COMPLAINT                        - 4                        Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

Occupied Palestinian Territories falls under the Geneva Convention. Since 1967, the IDF has implemented a policy of demolishing houses in these territories. According to B'tselem, an Israeli human rights organization, over 4100 homes have been demolished in the last 4 years alone. There is consensus in the international community and among international legal bodies that the IDF's policy of house demolitions in the Occupied Palestinian Territories is illegal under international law.

17. Rafah, where Rachel Corrie was killed, is a refugee camp and city located at the southern end of the Gaza Strip. The border between the Gaza Strip and Egypt is 12.5 kilometers long, of which 4 kilometers run alongside Rafah. The Gaza Strip is home to some 1.2 million Palestinians. According to Human Rights Watch, since approximately 2000, the IDF has demolished over 2,500 houses in Gaza, 1600 of which were located in Rafah. The IDF refers to the border area alongside Rafah as the "Philadelphi" corridor or zone. In Rafah, the IDF has frequently destroyed civilian houses, roads, and agricultural land. Because of the IDF's demolitions, more than 16,000 people, over 10% of Rafah's population, have lost their homes.

18. Most of the demolitions in the Gaza Strip have been aimed at depopulating Palestinian areas near Israeli settlements, bypass roads, and military bases. In Rafah, the IDF has used various pretexts to destroy swathes of housing to create a 'buffer zone' along the border, emptied of Palestinians, in order to facilitate its long-term control over the Gaza Strip, including in the event of an Israeli "disengagement" from the territory.

19. The IDF has also demolished thousands of homes in the West Bank for various 'administrative' purposes that are in reality demographically motivated. Houses have been demolished to make way for the 'separation barrier' that is being built to annex Israeli settlements in the West Bank while encircling Palestinian communities. Discriminatory and arbitrary application of building codes in occupied east Jerusalem have resulted in house demolitions in an attempt to control and limit the growth of the Palestinian population there.

- 5 -                    Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

20. The IDF has also demolished the homes of families or communities alleged to be connected to those thought to have participated in armed attacks against Israeli civilians or soldiers, even though such "collective punishment" is forbidden by the Fourth Geneva Convention. In many such cases, adjacent homes are also destroyed or damaged. Under international law, demolitions conducted as punitive measures are not military operations. At all times, the welfare of the local civilian population must be a primary consideration.

21. The IDF's security measures are clearly subject to requirements under international humanitarian law, which balances the interests of an occupying power against the interests of a civilian population. Under the Fourth Geneva Convention and other international humanitarian law, property can only be destroyed if it is "absolutely necessary" in preparation for or conduct of fighting; it cannot justify the preemptive and indiscriminate destruction of entire neighborhoods based solely on their location. Even in instances where military operations are used to justify other demolitions, intentional attacks on civilians and civilian property are strictly prohibited under international law.

22. Both the United Nations and international human rights organizations recognize that most people in the Occupied Palestinian Territories who have lost their homes due to demolitions are civilians. Further, rarely is compensation paid to the families who lose their homes.

23. In the Occupied Palestinian Territories, when demolishing houses, not only does the IDF often fail to give prior warning, in most instances residents are not even given a few minutes to save their personal possessions. The IDF has demolished houses, roads, and large fields without evidence that the destruction was absolutely necessary for military operations. The IDF has demolished blocks of houses and has indiscriminately torn up roads, destroying water and sewage networks. The pattern of destruction caused by demolitions demonstrates that IDF forces demolish homes regardless of whether they pose a specific threat.

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE (206) 398-4110
FACSIMILE (206) 398-4136

24. The loss suffered by Palestinians whose houses have been demolished is extensive and long-term. The resulting trauma is only the first stage that the families face in coping with the new reality imposed on them. In addition to the material damage inherent in the loss of the house and its contents, their forced displacement and total disruption in their lives and the accompanying psychological effect also serve as a punitive measure. The destruction has a particularly negative impact on children.

25. IDF house demolitions are arbitrary and disproportionate and in violation of international law. Numerous innocent Palestinians have been killed, injured, and have been made homeless due to the demolitions.

26. The world community, including the United States, has consistently condemned these demolitions of homes.

27. The IDF has admitted that house demolitions have not always occurred because of military necessity. Senior IDF officers have admitted that not all house demolitions have been authorized or justified and that destruction caused by demolitions has been excessive.

28. According to Article 53 of the Fourth Geneva Convention, "Any destruction by the Occupying Power of real or personal property belonging individually or collectively to private persons or to the State, or to other public authorities, or to social or cooperative organizations, is prohibited, except where such destruction is rendered absolutely necessary by military operations." This adapts the earlier Hague Regulations which forbid destruction or seizure of property unless "imperatively demanded by the necessities of war." However, the IDF has admitted that house demolitions have not always occurred because of military necessity. Senior IDF officers have admitted that not all house demolitions have been authorized or justified and that destruction caused by demolitions has been excessive.

29. The IDF has recently recognized that their policy of demolition of homes of suspected terrorists — a form of collective punishment as it affects family members not believed to be associated with violence - has not worked to deter violence against it.

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE (206) 398-4130
FACSIMILE: (206) 398 1136

Recently, senior IDF officers concluded that the policy has caused more harm than good, and officially ended this policy of demolitions for this purpose in February of 2005.  However, home demolitions for other reasons have not been suspended.

**B.  The Role of Defendant Caterpillar, Inc.**

30. Caterpillar is the United States industry leader in heavy equipment manufacturing. It produces bulldozers of various types, including two called the D9 and D10.  In 2004, Caterpillar had over $30 billion in sales and revenue.

31. Upon information and belief, since 1967, the IDF has used Caterpillar equipment, including the specially modified D9s and D10 type bulldozers, to destroy approximately 10,000 buildings in the West Bank and Gaza, leaving 50,000 people homeless.  The IDF has also used the same equipment to uproot hundreds of thousands of olive trees, as well as orchards of dates, prunes, lemons, and oranges causing widespread economic hardship and environmental degradation in rural areas.  The IDF has used, and continues to use, armored Caterpillar D9 bulldozers to raze blocks of homes, including in Gaza and Rafah.

32. As mentioned above, upon information and belief, Caterpillar began selling its bulldozers to Israel in 1967. Caterpillar began making and selling to the IDF the D9R type bulldozer, the bulldozer used in the majority of the more recent demolitions and the type used to kill Rachel Corrie.

33. On its website, Caterpillar advertises that it can alter its D9 bulldozers for military use.  *Inter alia*, it states, "Caterpillar® provides the flexibility to respond to the specialized, unique needs of U.S. military and government agencies along with foreign militaries . . . . We are also well staffed to design and manufacture high priority military modifications for our standard products, such as armor kits . . ." The Caterpillar D9 is a large track-type tractor with 354 kW (474 hp) of gross power and an operating weight of 49 tons.

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE (206) 398-4130
FACSIMILE (206) 398-4136

## C. Notice to Caterpillar Inc.

34. Upon information and belief, Caterpillar had constructive notice of such illegal acts as early as 1989, when the United Nations and human rights groups in Israel began condemning the demolitions as violations of international law. In 1999 international human rights groups began reporting the human rights violations associated with demolitions. Beginning at least in 2000, the United Nations issued a statement that Israel's policy of demolitions may amount to cruel, inhuman or degrading treatment or punishment, as well as a breach of Article 16 of the UN Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which Israel ratified in 1991. Beginning at least in 2002, the U.S. government through the State Department began criticizing Israel for such home demolitions.

35. Caterpillar has been on actual notice about illegal house demolitions in Gaza and Rafah since at least 2001, and likely before. Beginning at least in 2001, Caterpillar was specifically notified by concerned citizens that it was aiding and abetting crimes against humanity by providing IDF with the bulldozers used to destroy homes. Upon information and belief, in 2001, Caterpillar Spokesman Benjamin Cordani stated, among other things, "We do not base sales on customer's intended use for our product."

36. A significant number of letters and communications were sent to Caterpillar in 2002, including a letter sent in January of 2002 requesting that Caterpillar condemn the illegal use of its product, and noted that one "campaign" of home demolitions left 700 Palestinians, including women, children, and elderly people, homeless and without many personal possessions.

37. Upon information and belief, in April of 2002, eight members of the Shu'bi family, including several elderly persons and children, were killed when IDF demolished their house. Reports of these deaths were widely circulated by Amnesty International and International Press.

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington  98122-4340
TELEPHONE  (206) 398-4130
FACSIMILE  (206) 398-4136

38. Upon information and belief, in June of 2002, a handicapped man was killed in his house during a demolition when his family was not able to get him out in time.  Reports of this death were widely circulated by International Press.

39. Also in June of 2002, a U.S. based organization wrote a letter to Caterpillar executives informing Caterpillar that its equipment was being used to commit war crimes.

40. In early August 2002, a coalition of human rights and non-profit organizations began a campaign to educate Caterpillar about the illegal use of its bulldozers, and asked that Caterpillar stop selling or otherwise providing its bulldozers to Israel.  Because of this campaign, over 50,000 letters were sent to Caterpillar informing them that their bulldozers were used to destroy homes of innocent Palestinians, and were being used to carry out human rights abuses.

41. Numerous protests against Caterpillar were staged in 2002, including an International Day of Action against Caterpillar that was held throughout the world in August of 2002.  Protests included a mock arrest of Caterpillar executives for war crimes in September of 2002.  All of these events were widely reported by International Press.

42. Upon information and belief, in December of 2002, both a deaf man and an elderly man were crushed during home demolitions, both of which were widely reported by International Press.  Deaths due to home demolitions using Caterpillar bulldozers continued to occur in 2003 and 2004.

43. Moreover, such protests and letter writing campaigns similar to those described above continued into 2003 and continue to occur.  In April of 2004, a shareholder resolution proposed by Caterpillar shareholders stated Caterpillar has acknowledged that it is aware of IDF's use of Caterpillar equipment to destroy homes and agricultural lands, but refuses to condemn or take actions necessary to halt the sale or transfer of Caterpillar equipment to the IDF.  That same month, Plaintiffs wrote a letter to Caterpillar's CEO regarding IDF's use of

PLAINTIFFS' COMPLAINT                           - 10                        Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE  (206) 398-4116
FACSIMILE  (206) 398-4136

the Caterpillar bulldozers, and requested a meeting with Caterpillar.  Caterpillar refused such a meeting.

44. In May of 2004, Jean Ziegler, a Special Rapporteur for the United Nations, delivered a letter to Caterpillar criticizing it for supplying the bulldozers to the IDF that it knows are used to commit human rights violations, and stated that by supplying the bulldozers to the IDF, Caterpillar was potentially an accomplice to human rights violations.

**D.  Sales/Delivery of Bulldozers to IDF by Caterpillar**

45. As mentioned above, upon information and belief, Caterpillar began selling bulldozers for use in demolitions to the IDF in 1967.  Upon information and belief, in 1995, Caterpillar began making the R type D9 that was used to kill Rachel Corrie.

46. Upon information and belief, 1) Caterpillar bulldozers were provided to and/or sold to IDF by Caterpillar after Caterpillar was on actual or constructive notice that its bulldozers, specifically the D9s, were being used to commit human rights violations, the injuries from which were foreseeable; or 2) bulldozers were leased to the IDF by Caterpillar, and Caterpillar renewed such leases after Caterpillar was on actual or constructive notice that its bulldozers, specifically the D9s, were being used to commit human rights violations, the injuries from which were foreseeable; or 3) significant parts for the bulldozers, or repairs made to the bulldozers, or training, manuals and/or instructions regarding the Caterpillars used to commit abuses were provided to IDF by Caterpillar after Caterpillar was on actual or constructive notice that its bulldozers, specifically the D9s, were being used to commit human rights violations, the injuries from which were foreseeable; or 4) Caterpillar had the right to recall its bulldozers but failed to do so, all of which occurred after Caterpillar was on actual or constructive notice that its bulldozers, specifically the D9s, were being used to commit human rights violations, the injuries from which were foreseeable.  These acts allowed IDF to use Caterpillar bulldozers to commit the human rights abuses that, along with the resultant injuries, are the subject of this lawsuit.

PLAINTIFFS' COMPLAINT                    - 11

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

47. In the alternative, upon information and belief, 1) the Caterpillar bulldozers used in the incidents against Rachel Corrie were provided to and/or sold to IDF by Caterpillar after Caterpillar was on actual or constructive notice that its bulldozers, specifically the D9s, were being used to commit human rights violations, the injuries from which were foreseeable; or 2) the bulldozers used in the incidents against Rachel Corrie were leased to the IDF by Caterpillar, and Caterpillar renewed such leases after Caterpillar was on actual or constructive notice that its bulldozers, specifically the D9s, were being used to commit human rights violations, the injuries from which were foreseeable; or 3) significant parts for the bulldozers used in the incidents, or repairs made to the bulldozers used in these incidents, or training, manuals and/or instructions regarding the Caterpillar bulldozers used to commit abuses were provided to IDF by Caterpillar after Caterpillar was on actual or constructive notice that its bulldozers, specifically the D9s, were being used to commit human rights violations, the injuries from which were foreseeable; or 4) Caterpillar had the right to recall its bulldozers but failed to do so, all of which occurred after Caterpillar was on actual or constructive notice that its bulldozers, specifically the D9s, were being used to commit human rights violations, the injuries from which were foreseeable.

48. Caterpillar has stated to the press that its bulldozers are sold through the Foreign Military Sales Program. However, upon information and belief, the sales from Caterpillar to the IDF and/or Israel are not through the FMS, but are direct sales to IDF/Israel.

**E. Events Surrounding the Death of Rachel Corrie**

49. In January 2003, Rachel Corrie, then a 23 year-old senior at the Evergreen State College in Olympia Washington, traveled to the Middle East through a local group called Olympians for Peace in the Middle East. One of Rachel's main missions in traveling to Gaza was to create a sister-city relationship between Olympia and Rafah.

50. For many years, various groups have organized non-violent action, medical assistance, and humanitarian relief in the Occupied Territories. In the months preceding

PLAINTIFFS' COMPLAINT                 - 12                 Seattle University
                                                          Ronald A. Peterson Law
                                                          Clinic
                                                          1112 E. Columbia
                                                          Seattle, Washington 98122-4340
                                                          TELEPHONE: (206) 398-4130
                                                          FACSIMILE: (206) 398-4136

Rachel Corrie's death, efforts focusing on non-violent action had increased because of escalating violence including growing numbers of house demolitions. The group Rachel joined was founded in 2001. International human rights groups such as Amnesty International and Human Rights Watch, as well as the well-recognized Israeli human rights organization B'tselem support the efforts of international volunteers as a means to confront and monitor persistent human rights violations.

51. In Gaza, she joined a group of volunteers from around the world dedicated to using non-violent methods to work for Palestinian human rights and as peacemakers in the region. One of Rachel's most basic jobs entailed walking with Palestinian children to and from school to protect them from gunfire. In addition, Rachel Corrie regularly protected municipal water supplies, participated in youth education, and stood in front of Caterpillar bulldozers as a way to protect homes, farms, trees, and wells from demolitions that were in violation of international law. Before her trip to Gaza, Rachel Corrie had been organizing events as an activist in Olympia's peace movement and on the Evergreen campus.

52. On March 16, 2003, Rachel was in the Gaza Strip to protest the demolition of homes and property of Palestinian civilians. The IDF had been demolishing homes and property in the area for the past several days. There were two Caterpillar bulldozers involved in demolitions in that area on March 16, 2003. The two Caterpillar machines were accompanied by one Armored Personnel Carrier ("APC"), sometimes referred to as a "tank." Moreover, each bulldozer contained two IDF soldiers. The Caterpillar bulldozer driver and accompanying soldier remained in communication with those in the APCs via radio.

53. In the afternoon on March 16, 2003, the group of volunteers Rachel was with received a call indicating that IDF forces were approaching the home of a Palestinian pharmacist, Dr. Samir Nasrallah, and that it was believed the IDF was going to destroy the home. The group knew Dr. Nasrallah, and Rachel Corrie had, in the recent past, stayed in his home. The group of volunteers, including Rachel, proceeded to that location.

Seattle University
Ronald A. Peterson Law
Clinic
1112 E Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

54. Rachel stood in front of the Nasrallah home in order to protect it from demolition. There were no other structures between Rachel and the home. Rachel was wearing a bright orange florescent vest or jacket. She began waving her arms as the bulldozer approached in an attempt to protect the home from demolition. The bulldozer, which contained two soldiers—one driver and the other Commander, also used for "spotting"—continued to approach the home, notwithstanding the presence of Rachel. As the bulldozer moved forward, it was pushing a pile of dirt and debris. The bulldozer did not stop as it reached Rachel; it pushed the pile of debris onto her legs and she could not escape. The bulldozer than ran over Rachel with its blade down, burying her and crushing her beneath its blade. Upon information and belief, the bulldozer driver knew Rachel was in front of the bulldozer and intentionally ran her over.

55. During this entire incident, other non-violent protesters, all of whom were within meters of the bulldozer, were running, jumping, and waiving their arms at the driver, yelling at the driver and the Commander that Rachel was on the pile and about to be run over. The bulldozer never stopped until Rachel Corrie was beneath it. It then backed up, with its blade remaining down, again driving over Rachel. Rachel was taken to a hospital where she was later pronounced dead.

56. Even though there was a "spotter" in the bulldozer, and even though there was an APC within close proximity to the bulldozer who was in contact with the bulldozer by radio, the bulldozer driver did not stop when approaching Rachel, and intentionally ran her over, crushing her.

57. Just prior to this incident, the bulldozer drivers and/or the soldiers in the APCs had been aggressively shouting at the protestors.

58. Earlier that same day, one of the bulldozer drivers was particularly aggressive, pinning one other protestor under rubble and another against a fence.

PLAINTIFFS' COMPLAINT                    - 14                    Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

59. Upon information and belief, just minutes before running over Rachel Corrie, the bulldozer driver who ran her over had received orders to continue with the demolitions, even with the protestors present.  Upon information and belief, the IDF was going to demolish the home Rachel tried to protect.  Months later, the Nasrallah home was demolished by the IDF.

60. Plaintiffs' causes of action arise under and violate domestic and international law, agreements, declarations, conventions, resolutions and treaties, including but not limited to the following:

a)    Customary international law and treaties of the United States;

b)    Statutes and common law of the United States of America;

c)    Statutes and common law of the State of Washington;

d)    Statutes and common law of the State of Illinois;  and

e)    Any other applicable laws, domestic, foreign, or international.

## V.    FIRST CLAIM FOR RELIEF

### *(War Crimes)*

61. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 60 of this Complaint as if fully set forth herein.

62. The abuses committed against Rachel Corrie described herein were acts against a civilian population, in violation of the Fourth Geneva Convention, including but not limited to, Articles 27, 32, 33, 53, 71 and 72.

63.    The home demolition and attack on Rachel Corrie also constitute grave breaches of the Fourth Geneva Convention, found at Article 147 of the Fourth Geneva Convention, which includes as grave breaches: willful killing, torture or inhumane treatment, including willfully causing great suffering or serious injury to body or health. extensive destruction and appropriation of property not justified by military necessity and carried out unlawfully and wantonly.

PLAINTIFFS' COMPLAINT    - 15

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE (206) 398-4110
FACSIMILE (206) 398-4136

64. Caterpillar knew or should have known that the bulldozers it was supplying to IDF would be used to commit violations of the Geneva Convention, and that injuries complained of herein were a foreseeable result of such activity. Even with this knowledge, Caterpillar continued to supply bulldozers to the IDF knowing they would be used for such illegal purposes, and they were.

65. Moreover, by 1) supplying, selling, and/or entrusting bulldozers used to destroy their homes and inflict severe emotional distress; 2) renewing the lease of such equipment; 3) making repairs and/or supplying necessary parts and/or training, support, manuals, or other important information for the bulldozers; and/or 4) failing to provide a warning regarding the use of the bulldozers or to recall the bulldozers, cancel, or suspend the lease and/or sales of the bulldozers to the IDF even though legally entitled to do so, after it was foreseeable that acting or failing to act could lead to such abuses, and even after it knew or should have known through actual or constructive notice that the bulldozers were being used to commit war crimes, Caterpillar is directly responsible for war crimes.

66. Alternatively, and/or in addition to committing a war crime against Rachel Corrie, IDF's actions described above constituted war crimes against the Palestinian civilian population, and by knowingly supplying the specially-designed bulldozers to IDF when it knew or should have known that the bulldozers were being used to commit war crimes against the Palestinian civilian population, Caterpillar aided and abetted, conspired in, confirmed, or ratified IDF's war crimes. Rachel Corrie was a foreseeable victim of such crimes, and such crimes proximately caused the injuries complained of herein.

67. Defendant's acts and omissions constitute "tort[s] ... committed in violation of the law of nations or a treaty of the United States" under 28 U.S.C. §1331 in that the acts and omissions against Plaintiffs violated customary international law prohibiting war crimes as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

PLAINTIFFS' COMPLAINT        - 16

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

68.   Violations of these provisions of the Geneva Conventions are direct and enforceable treaty violations as well as violations of customary international law.

69.   The acts and omissions constituting war crimes caused Plaintiffs to suffer damages, including severe physical and mental pain and suffering, in amounts to be determined at trial.

70.   Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## VI.  SECOND CLAIM FOR RELIEF

*(Aiding and Abetting Extra-judicial Killing)*

71.   Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 70 of this Complaint as if fully set forth herein.

72.     The bulldozer drivers who caused the deaths of Rachel Corrie acted under the actual or apparent authority and/or color of law of the IDF.

73.   The killing of Rachel Corrie was deliberate and not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees that are recognized as indispensable by civilized peoples.  The killings were not *lawfully* carried out under the authority of any country or court.

74.  The killing of Rachel Corrie constitutes extra-judicial killings as defined by the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 (note)).  Additionally, the killing of Rachel Corrie also constitutes a tort committed in violation of the laws nations, and thus of the United States, as reflected in federal common law which incorporates extra-judicial killing, pursuant to 28 U.S.C. § 1331. Thus, the conduct constitutes a violation of the laws of nations and customary international law prohibiting extra-judicial killing, reflected, expressed, defined and codified in

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities, and is thus actionable under 29 U.S.C. §1331.

75. Caterpillar knew or should have known that the bulldozers it was supplying to Israel would be used to commit extra-judicial killings, and/or that the bulldozers it was supplying would be used to commit other human rights abuses, and that extra-judicial killings were a foreseeable result of such activity. Even with this knowledge, Caterpillar continued to supply bulldozers, and/or repairs, and/or parts, and/or training to the IDF.

76. Caterpillar gave substantial assistance to the IDF either by 1) supplying, selling, and/or entrusting bulldozers used to destroy their homes and inflict severe emotional distress; 2) renewing the lease of such equipment; 3) making repairs and/or supplying necessary parts and/or training, support, manuals, or other important information for the bulldozers; and/or 4) failing to provide a warning regarding the use of the bulldozers or to recall the bulldozers, cancel, or suspend the lease and/or sales of the bulldozers to the IDF even though legally entitled to do so. after it was foreseeable that acting or failing to act could lead to such abuses, and even after it knew or should have known through actual or constructive notice that the bulldozers were being used to commit extra-judicial killings. Thus, Caterpillar aided and abetted in this extra-judicial killing, and this aiding and abetting was a proximate cause of the extra-judicial killing. Rachel Corrie was a foreseeable victim of these acts.

77. Upon information and belief, because the conduct giving rise to the claim occurred in the United States – i.e.. the contracting and/or aiding and abetting and/or ratification – Plaintiffs are exhausting their remedies by bringing this action domestically.

78. In the alternative, no adequate remedies against Caterpillar are available to Plaintiffs under the laws of the State of Israel or before any court in their domestic jurisdiction. Even if a remedy was available, such would be ineffective, inadequate, unobtainable, or futile, and/or Plaintiffs would be unable to avail themselves to that remedy because the State of Israel was a party to the events described herein. The Israeli Supreme

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE. (206) 398-4130
FACSIMILE: (206) 398-4136

1  Court has consistently sanctioned IDF policies that violate international law, including house
2  demolitions aimed at collective punishment.

3      79. Defendant's acts and omissions described caused Plaintiffs to suffer damages,
4  including severe mental and emotional pain and suffering in an amount to be proven at trial.

5      80. Defendant's acts and omissions were deliberate, willful, intentional, wanton,
6  malicious and oppressive, and should be punished by an award of punitive damages in an
7  amount to be determined at trial.

8              **VII.  THIRD CLAIM FOR RELIEF**

9              *(Cruel, Inhuman or Degrading Treatment or Punishment)*

10     81. Plaintiffs re-allege and incorporate by reference the allegations set forth in
11  paragraphs 1 through 80 of this Complaint as if fully set forth herein.

12     82. The abuses committed against Plaintiffs and Rachel Corrie described herein each
13  separately constitutes cruel, inhuman, or degrading treatment or punishment (CIDTP).  These
14  acts include, but are not limited to:  the illegal destruction of homes resulting in severe
15  physical and psychological abuse and agony, humiliation, fear and debasement; the injury of
16  family members during such destruction, resulting in profound fear and anguish.

17     83. Caterpillar knew or should have known that the bulldozers it was supplying to
18  Israel were being and would be used to commit CIDTP. Moreover, by 1) supplying, selling,
19  and/or entrusting bulldozers to IDF used to destroy homes and inflict severe emotional
20  distress; 2) renewing the leases of such; 3) making repairs and/or supplying necessary parts
21  and/or training, support, manuals, or other important information for the bulldozers; and/or 4)
22  failing to provide a warning regarding the use of the bulldozers or to recall the bulldozers,
23  cancel, or suspend the lease and/or sales of the bulldozers to the IDF even though legally
24  entitled to do so, after it was foreseeable that acting or failing to do so could lead to such
25  abuses, and after it knew or should have known through actual or constructive notice that the
26  bulldozers were being used to commit CIDTP.

PLAINTIFFS' COMPLAINT                - 19                Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE, (206) 398-4136

84.  In the alternative, Caterpillar aided and abetted this CIDTP, and this aiding and abetting proximately caused the abuses described herein.

85.  Such acts were a proximate cause of the injuries complained of in this Complaint.  Rachel Corrie was a foreseeable victim of such acts.

86.  Defendant's acts and omissions constitute aiding and abetting of tort[s] ... committed in violation of the law of nations or a treaty of the United States under 28 U.S.C. §1331 in that the acts and omissions against Plaintiffs violated customary international law prohibiting CIDTP as reflected, expressed, and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.

87. Defendant's acts and omissions described caused Plaintiffs to suffer damages, including severe mental and emotional pain and suffering in an amount to be proven at trial.

88.  Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

89.  Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## VIII.  FOURTH CLAIM FOR RELIEF

*(Wrongful Death Under 740 ILCS 180)*

90.  Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 89 of this Complaint as if fully set forth herein.

91.  Defendant owed a duty to decedent Rachel Corrie because she was a foreseeable victim of IDF's illegal use of the bulldozers, based on the previous notice it had received.

92.  Defendant breached that duty either by 1) supplying, selling, and/or entrusting to the IDF bulldozers; 2) renewing the lease of such bulldozers; 3) making repairs and/or supplying necessary parts and/or training, support, manuals, or other important information

PLAINTIFFS' COMPLAINT                          - 20 -

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE (206) 398-4130
FACSIMILE (206) 398-4136

for the bulldozers; and/or 4) failing to recall the bulldozers, re-design, cancel or suspend the lease and/or sales of the bulldozers to the IDF and/or failing to retrain users of its equipment even though legally entitled to do so, when it was reasonably foreseeable that those bulldozers were being misused to destroy homes and other civilian property and to commit such abuses including the killing of civilians and causing severe emotional distress.

93. As a direct and proximate cause of Defendant's breach of duty, Rachel Corrie was killed. It was reasonably foreseeable that use of Defendant's bulldozers would cause such a death.

94. Under the Illinois Wrongful Death Act, the personal representative may bring such claims on behalf of the next of kin and siblings. Cynthia Corrie and/or Craig Corrie are the personal representative(s) of Rachel Corrie, and bring this claim on behalf of all of Rachel's next of kin, including themselves and her siblings.

95. Defendant's acts and omissions described herein caused Plaintiffs and all of Rachel's next of kin, including her siblings, to suffer damages, including pecuniary damages, in an amount to be proven at trial.

96. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## IX.    FIFTH CLAIM FOR RELIEF

### (Public Nuisance)

97. Plaintiffs re-allege and incorporate by reference the allegations set forth in paragraphs 1 through 96 of this Complaint as if fully set forth herein.

98. The Palestinian public and non-Palestinian civilians in the area, such as Rachel Corrie, had and have a right to health, the public safety, the public peace, the public comfort, and/or the public convenience.

PLAINTIFFS' COMPLAINT                          - 21                          Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

99.    The IDF has interfered with the aforementioned rights by committing the abuses described herein. The Defendant has also interfered with these rights by 1) supplying, selling, and/or entrusting bulldozers used to destroy homes and inflict severe emotional distress; 2) renewing the lease of such equipment; 3) making repairs and/or supplying necessary parts and/or training, support, manuals, or other important information for the bulldozers; and/or 4) failing to recall the bulldozers, re-design, cancel or suspend the lease and/or sales of the bulldozers to the IDF and/or failing to retrain users of its equipment even though legally entitled to do so, after it was foreseeable and/or after it knew or should have known that IDF would use those bulldozers to intentionally interfere with the aforementioned rights. By so doing, Defendant has created a public nuisance.

100. Defendant's acts and omissions described caused Plaintiffs to suffer damages, including severe mental and emotional pain and suffering in an amount to be proven at trial.

101. Defendant's acts and omissions were deliberate, willful, intentional, wanton, malicious and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

## X.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against the Defendant as follows:

(a)    For compensatory damages in an amount to be proven at trial, but in an amount over $75,000;

(b)    For punitive and exemplary damages in an amount to be proven at trial;

(c)    For reasonable attorneys' fees and costs of suit;

(d)    For injunctive relief; and

(e)    For such other and further relief as the court may deem just and proper.

PLAINTIFFS' COMPLAINT                                    - 22

Seattle University
Ronald A. Peterson Law
Clinic
1117 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE: (206) 398-4130
FACSIMILE: (206) 398-4136

1

2   A jury trial is demanded on all issues.

3

4 DATED this 15th March. 2005.    SEATTLE UNIVERSITY
                 RONALD A. PETERSON LAW CLINIC

5

6

7                Gwynne L. Skinner, WSBA No. 23490
                Davida Finger. WSBA No. 32818

8

9                JENNIFER M. GREEN
                CENTER FOR CONSTITUTIONAL RIGHTS

10             666 Broadway, 7th floor
                New York, NY  10012

11             Tel: (212) 614-6431
                Fax: (212) 614-6499

12             jgreen@ccr-ny.org

13             GWYNNE L. SKINNER
             PUBLIC INTEREST LAW GROUP PLLC

14             705 SECOND AVENUE, SUITE 501
                SEATTLE, WA  98104

15             Tel:  (206) 447-0103
             Fax:  (206) 447-0115
             gskinner@pilg.org

16

17

18

19

20

21

22

23

24

25

26

PLAINTIFFS' COMPLAINT      - 23 -

Seattle University
Ronald A. Peterson Law
Clinic
1112 E. Columbia
Seattle, Washington 98122-4340
TELEPHONE  (206) 398-4130
FACSIMILE  (206) 398-4136